# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# MACON DIVISION

| | |
|---|---|
| WILLIE B. TURNER, | : |
| Plaintiff, | : |
| | : NO. 5:06-CV-293 (CAR) |
| VS. | : |
| HALE EDWARD BURNSIDE, *et al.*, | : |
| | : Proceedings Under 42 U.S.C. §1983 |
| Defendant. | : Before the U.S. Magistrate Judge |

## RECOMMENDATION

Before the court is a Motion for Summary Judgment filed by Defendants Hale Edward Burnside, Calvin Ramsey, Otis Wright, and Roger Hinkle. Doc. 54. Because the evidentiary materials presented to the Court fail to create a genuine issue of material fact as to Plaintiff's claims of deliberate indifference, it is hereby **RECOMMENDED** that the motion be **GRANTED**.

## FACTUAL AND PROCEDURAL BACKGROUND

In his Complaint, Plaintiff alleges violations of his rights under the Eighth Amendment, related to an electric shock he allegedly received while working in the kitchen at Men's State Prison. Plaintiff alleges that Defendants Wright and Hinkle were deliberately indifferent in failing to protect him from the risk of shock and in failing to render aid during the alleged incident. Plaintiff claims that Defendants Burnside and Ramsey were deliberately indifferent to his serious medical needs, in failing to send him to the hospital after the incident.

The facts, taken in the light most favorable to the Plaintiff, are as follows: At approximately 4:00 a.m. on August 24, 2004, while incarcerated in Men's State Prison (MSP), Plaintiff reported to work in the prison kitchen. Oscar Wright, the Food Services Manager, was supervising the

1

breakfast detail. His superior, Roger Hinkle, was not present. Also present in the kitchen were inmates Mitchell Butler, James Cook, and Tommy Green.

At some point during the breakfast detail, Wright instructed the Plaintiff to remove the last tray of reheated eggs from one of several electric ovens. The particular oven at issue had been cutting itself off throughout the morning. The oven was known to malfunction frequently, and other inmates had received mild shocks from the oven in the past. Plaintiff has testified that he observed Wright himself get "popped" by the oven shortly before Plaintiff was shocked. Pl.'s Dep. Vol. 1, p. 82 (Doc. 54-5). At the time Wright asked Plaintiff to take the eggs from the oven, the kitchen was flooded with two to three inches of water that had been poured on the floor by Inmate Green.

According to Plaintiff, when he grasped the handle on the oven door, he received an electric shock so powerful that he became stuck to the oven and had to use both hands and one of his legs to free himself from the current. Plaintiff claims that, in spite of his repeated pleas to cut the power while he was being shocked, Defendant Wright refused to turn off the oven's circuit breaker or offer him any other assistance. Plaintiff has testified that Wright simply laughed and said, "I knew I was going to get you."

Immediately after the alleged incident, Plaintiff was taken to the prison's medical unit. He has testified that he cannot remember whether he walked there or was carried there. Once at the medical unit, Plaintiff complained of numbness, throbbing pain, and swelling in his hands and legs. His entire body was physically examined by a nurse and he was given an electrocardiograph (EKG). The physical examination revealed that the Plaintiff had a full range of motion in his extremities, normal vital signs, and no electrical burns or other related injuries. The EKG results were also within normal limits. A few hours later, at the request of the examining nurse, Plaintiff was seen by Defendant Burnside. Observing no neurological deficits, burns, or other objective changes in the

Plaintiff's physical condition, Defendant Burnside concluded that no additional treatment was required. Later that evening, Plaintiff returned to the medical unit complaining of dizziness, nausea, and vomiting. He was examined by a nurse, given Tylenol, and told to return if needed.

The following day, Plaintiff returned to medical complaining of vomiting, sore muscles, and headaches. He was seen by Dr. Minerve, who noted that Plaintiff's motor sensory, reflexes, and vital signs were normal. Dr. Minerve ordered lab work and prescribed Phenegran, Prilosec, Ensure, a fluid diet, and a three day lay-in to treat the Plaintiff's nausea. After this visit, according to the medical records submitted by the Plaintiff, Plaintiff received nearly continuous medical care and treatment for these as well as various other symptoms stemming from conditions which existed prior to the alleged incident. These pre-existing conditions included swollen legs, problems with both of his hands, high blood pressure, sinus problems, obesity, and blood in his stools.

## LEGAL CLAIMS

### Failure to Protect

Plaintiff has failed to present evidence sufficient to create a genuine issue of material fact as to his claims against Wright and Hinkle. To establish a violation of the Eighth Amendment in cases involving failure to prevent harm, a prisoner must show that he is incarcerated under conditions posing substantial risk of serious harm, and that officials displayed "deliberate indifference" to inmate health or safety. Farmer v. Brennan, 511 U.S. 825, 839 (1970). To show deliberate indifference, the prisoner must prove: 1) that there was a substantial risk of serious harm to inmate health or safety; 2) that the defendant official was aware of facts from which an inference could be drawn that the substantial risk of serious harm existed; 3) that the official actually drew the inference; and 4) that the official failed to act to alleviate the risk or to protect the inmate therefrom, through more than an ordinary lack of due care for prisoner's interests or safety. Id. The known risk

of injury must have been a strong likelihood, rather than a mere possibility, before an official's failure to act can constitute deliberate indifference. Edwards v. Gilbert, 867 F.2d 1271, 1276 (11th Cir. 1989); See also Hudson v. Palmer, 468 U.S. 517, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984). Furthermore, a prison official's failure to alleviate a significant risk that he should have perceived but did not does not constitute infliction of punishment for Eighth Amendment purposes. Farmer at 837.

In this case, even when considered in a light most favorable to the Plaintiff, the evidence is simply not sufficient to allow a jury to conclude that Wright was aware the oven posed a substantial risk of serious harm. Plaintiff has testified that the oven was known to malfunction and that Wright himself had received a mild "pop" shortly before Plaintiff claims he was shocked. This testimony fails to show that Wright was aware that the oven could cause substantial harm. To the contrary, Wright's apparent willingness to handle the oven himself indicates that he considered the oven's malfunctioning to be a minor problem. At most, Plaintiff's evidence presents a question of ordinary negligence, and is insufficient to authorize a finding of deliberate indifference. No reasonable jury could find that Wright was deliberately indifferent in directing the Plaintiff to remove eggs from the oven.

Plaintiff has also failed to present evidence to support his claim that Defendant Wright was deliberately indifferent in failing to switch off the oven's circuit breaker during the time of the actual electrocution. According to the Plaintiff's version of the facts, at the time he was shocked, he, along with at least two other inmate kitchen employees, was standing in several inches of soapy water. The circuit breaker is behind a locked door located along the wall by the ovens. In order to access the breaker, Defendant Wright would have had to cross the same several inch deep pool of soapy water. Plaintiff's testimony indicates only that Wright may have failed to appreciate the seriousness

4

of the incident or may have hesitated to expose himself to harm in order to aid Plaintiff. Again, such evidence establishes negligence at most, not deliberate indifference.

## Medical Deliberate Indifference

Plaintiff's claims against Dr. Burnside are unsupported by the record of evidence in this case. Plaintiff's records show that he received extensive medical care while at Men's State Prison, both from his alleged injuries resulting from the shock and from numerous other medical issues. This record of extensive treatment negates any claim of deliberate indifference to serious medical needs.

To establish a constitutional violation relating to medical treatment, a prisoner must allege acts or omissions sufficiently harmful to evidence "deliberate indifference to a serious medical need." Estelle v. Gamble, 429 U.S. 97, 106 (1976). To show deliberate indifference, the prisoner must satisfy both an objective and a subjective component. Hill v. DeKalb Regional Youth Detention Center, 40 F.3d 1176, 1186 (11th Cir. 1994) ), *overruled in part on other grounds,* Hope v. Peltzer, 536 U.S. 730 at 739 (2002), (citing Wilson v. Seiter, 501 U.S. 294 (1991) (subjective component), Whitley v. Albers, 475 U.S. 312 (1986)(subjective component), and Rhodes v. Chapman, 452 U.S. 337 (1981)(objective component). With regard to the objective component, a prisoner must allege both an objectively serious medical need that, if left unattended, poses a substantial risk of serious harm, and also that the response by the prison official to that need was poor enough to constitute an unnecessary and wanton infliction of pain. Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000). With respect to the subjective component, a prisoner must allege, and ultimately prove, three facts: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence. McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir.1999). As these requirements make clear, in the context of a lawsuit brought

pursuant to 42 U.S.C. §1983, "mere accidental inadequacy, negligence in diagnosis or treatment, [and] even medical malpractice" are not actionable. Taylor, 221 F.3d at 1258.

The records in this case fail to suggest even ordinary negligence, much less deliberate indifference. Instead, they show that Plaintiff continued to receive treatment for his injuries for several months after the alleged shock, including referral to specialists, diagnostic procedures, and drug therapy. Plaintiff's medical records as well as his own statements indicate that, immediately after the alleged incident, he was examined by a nurse, given an EKG, and then seen by Defendant Burnside. The medical records indicate that Plaintiff did not have any apparent burns or an irregular heartbeat as a result of the shock. They also indicate that Dr. Burnside and the nurses took seriously Plaintiff's complaints of nausea, dizziness, and numbness. Plaintiff received additional treatment on the following day, when Dr. Minerve ordered laboratory blood tests and prescribed medication, a fluid diet, and three days of bed rest.

When Plaintiff continued to complain a week later of headaches, muscle tenderness, and blood in his stool, Dr. Burnside referred him to a neurologist for further evaluation. The neurologist prescribed Neurontin and ordered lab tests. The record does not indicate the results of the lab tests, but Plaintiff returned to the neurologist for a follow-up on October 21, 2004. In February 2005, his prescription was changed from Neurontin to Inderal. Later in February Plaintiff participated in a teleconference with Dr. Burnside and the neurologist. In March the neurologist ordered an EEG, which returned normal results. Plaintiff continued to receive treatment from the neurologist throughout 2005. Plaintiff has presented 47 pages of "Medical Excerpts" related solely to Plaintiff's treatment for the alleged shock.

In addition to treatment for conditions allegedly resulting from his electric shock, Plaintiff received extensive treatment for numerous other injuries and medical conditions unrelated to the

shock. Plaintiff received treatment for a knee injury resulting from a slip and fall incident in the kitchen, for gastro-esophageal reflux disease, for a swollen lymph node in his thigh, and for pulmonary arterial hypertension. Diagnostic procedures performed on Plaintiff included MRIs, CT scans, x-rays, and echocardiogram tests. Treatment included drugs and surgical procedures. The records of extensive medical care for all of Plaintiff's medical concerns, including concerns arising from the alleged shock incident, show that there can be no genuine issue of material fact as to claims of deliberate indifference to serious medical needs against either Dr. Burnside or Ramsey.

## Supervisory Liability

Plaintiff has presented no evidence to show that Defendants Ramsey or Hinkle were personally involved in any way in the actions that gave rise to his claims. It is undisputed that Hinkle was not present at the scene of the alleged shock, and there is no evidence that he had any knowledge of the condition of the oven in question. There is no evidence that Ramsey exercised any direct or indirect control over decisions related to Plaintiff's medical care. "Supervisory officials cannot be held liable under Section 1983 for the unconstitutional actions of their subordinates based on respondeat superior liability." Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1308 (11th Cir. 2006). To establish supervisory liability, a plaintiff must show either that the supervisor personally participated in the alleged constitutional violation, or that there is a causal connection between the actions of the supervisor and the alleged constitutional violation. Id. In this case, there is no evidence to create a genuine issue of material fact as to supervisory liability.

## Motions to Exclude Expert Testimony

Both Plaintiff and Defendants have filed competing motions to exclude expert testimony. Plaintiff seeks to exclude the expert testimony of Bruno Frazier, Ph.D., an electrical engineer who reports his opinion that Plaintiff could not possibly have been shocked by the oven in question.

7

Defendants seek to exclude the expert testimony of Plaintiff's counter-expert, Richard Pearlstein, an electrical engineer who challenges Frazier's conclusions. Neither report was pertinent to the present Recommendation, as the Recommendation assumes for the sake of argument that there are genuine issues of material fact to indicate that Plaintiff received some shock from the oven.[1]

In any event, both expert reports appear to be based on sound principles of basic electrical engineering. They differ primarily in their underlying assumptions as to the condition of the oven and surrounding wiring, the conditions in the kitchen, and the actions of Plaintiff and other parties. These differences are more properly a subject for cross-examination than a basis for exclusion under Rule 702 of the Federal Rules of Evidence.

<u>Conclusion</u>

Because the evidence on record in this case presents no genuine issues of material fact and because Defendants are entitled to judgment as a matter of law, it is **RECOMMENDED** that Defendants' Motion for Summary Judgment (Doc. 54) be **GRANTED**. It is further **RECOMMENDED** that both Plaintiff's and Defendants' Motions to Exclude (Docs. 55, 62) be **DENIED**. Pursuant to 28 U.S.C. §636(b)(1), the parties may serve and file written objections to this **RECOMMENDATION** with the district judge to whom this case is assigned **WITHIN FOURTEEN (14) DAYS** after being served with a copy thereof.

**SO RECOMMENDED**, this 22nd day of February, 2010.

s/ Charles H. Weigle
Charles H. Weigle
United States Magistrate Judge

---

[1] Evidence to indicate that Plaintiff was shocked includes not only his own testimony, the testimony of fellow inmate Mitchell Butler, and of Defendant Wright, but also the medical records, showing that all medical staff took Plaintiff's complaints of injury seriously and provided him extensive treatment for those complaints.